In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
No. 22-1611
VARREN KING,
 Plaintiﬀ-Appellant,
 v.

THOMAS J. DART, Sheriﬀ of Cook County,
OFFICER R. SZUL, and COOK COUNTY, ILLINOIS,
 Defendants-Appellees.
 ____________________

 Appeal from the United States District Court for the
 Northern District of Illinois, Eastern Division.
 No. 21-cv-0783 — Sharon Johnson Coleman, Judge.
 ____________________

 ARGUED NOVEMBER 7, 2022 — DECIDED MARCH 22, 2023
 ____________________

 Before FLAUM, EASTERBROOK, and ST. EVE, Circuit Judges.
 ST. EVE, Circuit Judge. Varren King is a pretrial detainee at
the Cook County Jail. He sued Cook County Sheriﬀ Thomas
Dart, Oﬃcer R. Szul, and Cook County for claims arising out
of a March 29, 2019, incident in which another detainee
punched him and threw hot coﬀee on him, causing third-de-
gree burns. The district court granted summary judgment to
the defendants, finding that King had failed to exhaust his
2 No. 22-1611

administrative remedies as required by the Prison Litigation
Reform Act (“PLRA”). For the reasons stated below, we aﬃrm
in part and reverse in part.
 I. Background
 On March 29, 2019, Varren King was in Division 9, Tier 3H
of the Jail when another detainee punched him in the face and
threw hot coﬀee on him. No oﬃcer was supervising Tier 3H
at the time. Oﬃcer R. Szul, the assigned tier oﬃcer, had left
for approximately thirty-two minutes to provide backup for
another oﬃcer conducting a security check in another tier.
When Szul returned, King told him that he needed medical
attention, but Szul failed to facilitate such treatment. King was
not examined until the next day. The nurse who evaluated
him described his burns as “severe,” and he was later trans-
ferred to Stroger Hospital.
 Four days later, King filed a grievance contending that the
Jail staﬀ failed to protect him, resulting in his injuries. He filed
a second grievance later that day, alleging a delay in treat-
ment for third-degree burns. It stated in full:
 On 3-30-2019 around 8:00 am–11:00 pm Sgt. Heinz
 came and recorded me about the Incident that hap-
 pened on 3-29-2019 with Inmate Ortiz. Sgt. Heinz and
 [Cook County Department of Corrections (“CCDOC”)]
 Staﬀ to inform and proceed to take me to Stroger Hos-
 pital of the Incident that occurred on 3-29-2019. For 24
 hours, I did not receive any medical attention for the
 3rd degree burn on my left side face and left side shoul-
 der. Medical Staﬀ are liable by not attending my med-
 ical needs.
No. 22-1611 3

In the box labeled “name and/or identifier(s) of accused,”
King wrote “Division 9 CCDOC Staﬀ/ Sgt. Heinz” and “Divi-
sion 9 Medical Staﬀ.”
 That same day, a Jail employee gave him an “Inmate
Grievance Response/Appeal Form” regarding his failure-to-
protect grievance. The form directed him to an attached doc-
ument, which stated: “Your allegation(s) have been for-
warded to the Oﬃces of Professional Review [(‘OPR’)] and
Divisional Superintendent for review and/or investigation.
You may follow-up with [OPR] by contacting their oﬃce di-
rectly, by utilizing the address below or submitting an inmate
request form, to speak with the Divisional Superintendent.”
The response form itself stated that “[t]o exhaust administra-
tive remedies, grievance appeals must be made within 15 cal-
endar days of the date the inmate received the response. An
appeal must be filed in all circumstances in order to exhaust
administrative remedies.” King signed the grievance re-
sponse form, acknowledging that he had received a copy of
the grievance response.
 Less than a week later, King received a response to his sec-
ond grievance regarding his delayed-medical-treatment alle-
gations, which stated: “Record reflects you were taken to Ur-
gent Care where you were assessed [and] transferred to
Stroger [H]ospital by ambulance. Received care.” He
acknowledged that he received a copy of the form by signing
it. As with the first grievance response, this document stated,
“[t]o exhaust administrative remedies, grievance appeals
must be made within 15 calendar days of the date the inmate
received the response. An appeal must be filed in all circum-
stances in order to exhaust administrative remedies.” King
appealed the response that same day.
4 No. 22-1611

 A couple days later, Deputy Sheriﬀ Felix Hernandez inter-
viewed King as part of the OPR investigation. That day, King
signed a form titled “Detainee/Complaint Notification,”
which stated, “I understand that if I do not file a complaint
register within 10 days that OPR will close the investigation
….” King did not file a complaint register, and his investiga-
tion was closed on May 29, 2019. He did not appeal the clo-
sure.
 King filed this suit on February 11, 2021, bringing two
claims against Szul and one claim against the Sheriﬀ and
County under 42 U.S.C. § 1983. With respect to Szul, King al-
leged that Szul failed to protect him by leaving Tier 3H unsu-
pervised and failed to promptly facilitate medical treatment
for him. Against the Sheriﬀ and Cook County, King brought
a Monell claim, alleging a widespread practice of tier oﬃcers
abandoning their assigned tiers for prolonged periods of time.
See Monell v. Dep’t of Soc. Servs., 436 U.S. 658 (1978).
 The district court granted the defendants’ motion for sum-
mary judgment for failure to exhaust administrative reme-
dies. On King’s failure-to-protect claim, the court found that
King had failed to exhaust because he did not appeal the
grievance response, file a complaint register with OPR, or ap-
peal the closure of its investigation. And although King ap-
pealed the response to his delayed-medical-treatment griev-
ance, the court reasoned that his grievance failed to give the
defendants notice of the claim because it did not allege any
wrongdoing by Szul or any other correctional oﬃcer. Lastly,
the district court found that King did not file a grievance al-
leging a practice of leaving detainees unsupervised and thus
could not proceed on his Monell claim. King timely appealed
this decision.
No. 22-1611 5

 II. Analysis
 King appeals the district court’s grant of summary judg-
ment regarding his failure-to-protect and delayed-medical-
treatment claims against Szul.1 The PLRA requires prisoners
to exhaust all available administrative remedies before suing
in federal court. Pavey v. Conley, 544 F.3d 739, 740 (7th Cir.
2008). As the Supreme Court has explained, “the benefits of
exhaustion … include allowing a prison to address com-
plaints about the program it administers before being sub-
jected to suit, reducing litigation to the extent complaints are
satisfactorily resolved, and improving litigation that does oc-
cur by leading to the preparation of a useful record.” Jones v.
Bock, 549 U.S. 199, 219 (2007).
 The exhaustion requirement is strict but not absolute. See
Reid v. Balota, 962 F.3d 325, 329 (7th Cir. 2020). “A prisoner
need not exhaust remedies if they are not ‘available.’” Ross v.
Blake, 578 U.S. 632, 636 (2016). When “an administrative
scheme [is] so opaque that it becomes, practically speaking,

 1 King also argues, in a footnote, that the district court erred in grant-

ing summary judgment on his Monell claim. But as the defendants point
out, King has waived this argument because he states only that he “ade-
quately complained of an incident or event when he was attacked and al-
leges that the staﬀ was not present to deter and prevent violence.” See
Lanahan v. County of Cook, 41 F.4th 854, 866 (7th Cir. 2022) (noting that
“perfunctory, underdeveloped, and cursory” arguments are waived).
Even if it were not waived, King’s argument would fail. Neither of the
grievances he filed contain any allegations of a widespread practice of tier
oﬃcers leaving their tiers unsupervised to assist oﬃcers in other tiers. To
plead a claim based on a defendant’s widespread practice, it is not enough
to allege that, in one instance, a tier oﬃcer left his tier unsupervised to
provide backup for another oﬃcer in another tier. Summary judgment
was therefore appropriate on this claim.
6 No. 22-1611

incapable of use,” for example, prisoners are not required to
exhaust. Id. at 643. The rules must be so confusing as to be
“essentially unknowable—so that no ordinary prisoner can
make sense of what it demands.” Id. at 644 (internal quotation
marks and citation omitted). “In our recent cases addressing
the PLRA’s exhaustion requirement, we have stressed that
prisons should create understandable grievance procedures,
ones clear and transparent enough to allow ordinary inmates
to navigate them.” Hacker v. Dart, --- F.4th ----, No. 21-2910,
2023 WL 2531505, at *1 (7th Cir. Mar. 16, 2023).
A. Failure to Protect
 On the same day that King filed his failure-to-protect
grievance, a Jail employee gave King a grievance response
form with an attached document informing him that his com-
plaint had been forwarded to OPR and the Divisional Super-
intendent for review and/or investigation. King does not dis-
pute that he failed to appeal the grievance response, file a
complaint register, or appeal the closure of his OPR investi-
gation. Instead, he contends that he was not required to ex-
haust because the process of appealing a grievance that is re-
ferred to OPR or the Divisional Superintendent is so opaque
that the remedy is unavailable. The standard set out in Ross is
demanding and cannot be met by demonstrating that the pro-
cess is “mere[ly] ambigu[ous].” Reid, 962 F.3d at 329. Never-
theless, we find that King has carried his heavy burden here.
 We recently addressed this precise grievance procedure
involving referrals to OPR and the Divisional Superintendent
in Hacker. In that case, the prisoner had forfeited his conten-
tion that the grievance process was unavailable because he
waited until his reply brief to make the argument. Despite re-
viewing only for plain error, we held that the prisoner was not
No. 22-1611 7

required to exhaust the Jail’s grievance procedure because it
“fell well short of” being “transparent enough for ordinary
prisoners to navigate.” Hacker, 2023 WL 2531505, at *6. Spe-
cifically, we held that “the Cook County Jail’s grievance pro-
cedures became unavailable to Hacker after the jail involved
OPR.” Id. at *4.
 Hacker applies with equal force here. On the same day that
King filed his failure-to-protect grievance, the Jail gave him a
response form stating that his grievance had been forwarded
to OPR and the Divisional Superintendent. The defendants
argue that King was supposed to appeal this response form to
exhaust the grievance procedure, but nothing in its commu-
nications with King made this clear. To be sure, both the In-
mate Handbook King signed when he was first booked into
the Jail2 and the response form he received after he filed his
grievance state that inmates must appeal the response within
fifteen calendar days to exhaust the grievance process. But
neither addressed whether and how a referral to OPR or the
Divisional Superintendent aﬀects this obligation.
 A commonsense reading of the referral notice suggested
to King that there was nothing for him to do. As we explained
in Hacker, “anyone receiving the notice of referral would have
reacted by thinking the process was working and moving for-
ward as it should.“ Id. at *3. To an ordinary prisoner, the no-
tice appeared to be an update regarding the grievance

 2 The Inmate Handbook states in a section titled, “The Inmate Griev-

ance Process”: “If you are dissatisfied with the grievance response, you
have 15 calendar days from receipt of the decision to appeal. A grievance
appeal must be filed in all circumstances in order to exhaust administra-
tive remedies under the CCDOC grievance procedure.”
8 No. 22-1611

procedure, not a denial of his grievance. “[T]he clear and sen-
sible takeaway from the notice was that [King] should stand
by while OPR investigated his complaint.” Id. The document
did not suggest that King had to appeal at that time.
 Indeed, it is diﬃcult to imagine what purpose an appeal
of the grievance response form could possibly have served. If
King had appealed the referral notice, the Jail would have
likely reiterated that it referred the grievance to OPR and ad-
vised him to wait for the results of that investigation. Under
CCDOC policy, social workers who collect grievances do not
make any determination on the merits of a grievance and
merely forward the grievance to an entity for response. There
is no evidence suggesting that the Jail had a diﬀerent protocol
for prisoners who appealed their referrals. And what if King
attempted to sue after receiving this unsatisfactory response
to his appeal? The district court might have dismissed his case
because his OPR investigation was still pending. See Reid, 962
F.3d at 328 (noting that the district court found that the pris-
oner filed suit “too soon because an Internal Aﬀairs ‘investi-
gation was pending’”).
 The district court here stated that King should have filed a
complaint register regarding OPR’s final disposition or ap-
pealed the closure of its investigation, but the Jail’s communi-
cations suggested otherwise. In the referral notice, the Jail in-
formed King that he could “follow up” on the investigation
by contacting OPR or the Divisional Superintendent directly,
which “suggested that the OPR process operated separately
and apart from formal grievance channels.” Hacker, 2023 WL
2531505, at *4; see also Bowers v. Dart, 1 F.4th 513, 518–19 (7th
Cir. 2021) (depicting an internal-aﬀairs investigation as sepa-
rate from the grievance procedure). Moreover, the Jail did not
No. 22-1611 9

provide appeal forms or instructions for how to appeal after
the closure of an OPR investigation. Like in Hacker, “the only
appeals form that the jail had sent to [King] was attached to a
diﬀerent document (the notice of referral) and had apparently
expired long before OPR closed the investigation.” Hacker,
2023 WL 2531505, at *4. Lastly, the Jail provided little to no
information concerning an OPR or Divisional Superintendent
investigation. For all King knew, the investigations could
have taken weeks or months, and “[i]f [King] believed he
needed to hear from either or both entities before suing, he
would have resigned himself to an indefinite wait—and
might have continued to wait even after OPR closed its inves-
tigation.” Id. “All of this suggested to [King] that there was
nothing left for him to do.” Id.
 In sum, the Jail’s communications to King presented unin-
tuitive, conflicting directions regarding the grievance appeals
process, eﬀectively obscuring the process such that “there was
no conceivable step for [him] to take.” Reid, 962 F.3d at 330.
The remedy was therefore unavailable, and King was not re-
quired to exhaust before bringing this claim in court. Ross, 578
U.S. at 636.
B. Delayed Medical Care
 The district court also dismissed King’s delayed-medical-
care grievance for failure to exhaust. It found that, although
King had filed a grievance and appealed the Jail’s response,
the allegations of the grievance did not give the Jail proper
notice of his claim against Szul. We agree.
 One of the purposes of the PLRA exhaustion requirement
is to give the Jail “a fair opportunity to address [the prisoner’s]
complaint,” Maddox v. Love, 655 F.3d 709, 722 (7th Cir. 2011),
10 No. 22-1611

but King’s grievance did not even mention Szul. King stated
only that medical staﬀ were liable for his injuries, and where
he did discuss the actions of correctional staﬀ, he alleged only
that they took him to the hospital. Because the allegations in
the grievance do not support the claim he pursued in this law-
suit, King did not give the Jail notice of his claim against Szul.
See Bowers, 1 F.4th at 517 (finding that the prisoner failed to
exhaust because there was a “disconnect between the griev-
ance and complaint”).
 King’s arguments to the contrary are unpersuasive. First,
King contends that his grievance gave suﬃcient notice to the
Jail because it provided the same location and described the
same incident as in the complaint and listed “Division 9
CCDOC Staﬀ” as the accused. None of these facts, individu-
ally or taken together, point to Szul or any other correctional
oﬃcer being liable for King’s injuries. In fact, the grievance
explicitly states that it was the medical staﬀ, not the correc-
tional oﬃcers who were responsible for his injuries. See Rob-
erts v. Neal, 745 F.3d 232, 235–36 (7th Cir. 2014) (holding that
the grievance failed to indicate that the defendant was the ac-
cused, in part, because the grievance suggested that a doctor
was at fault and the defendant was not a doctor). The griev-
ance further stated that the correctional oﬃcers took him to
the hospital the day after his injury, suggesting that they ful-
filled their duty to facilitate medical treatment for him.
 Even if the Jail was aware that King thought some correc-
tional oﬃcers were liable, King did not provide suﬃcient in-
formation for the Jail to determine that Szul was the accused.
The grievance listed Sgt. Heinz by name and generally stated
that CCDOC Staﬀ on March 30, 2019, took him to receive
medical treatment. But Szul was not on duty on March 30,
No. 22-1611 11

2019—he was on duty on March 29, 2019—so there would be
no reason for the Jail to think that King believed Szul to be
responsible for his injury. See Schillinger v. Kiley, 954 F.3d 990,
994–95 (7th Cir. 2020) (finding that the prisoner failed to give
the defendants notice of his claim because his allegations did
not “place these oﬃcers at the scene of the attack”).
 Second, King argues that he did not fail to exhaust because
the Jail responded to his grievance on the merits. He cites
Maddox for the proposition that “[w]here prison oﬃcials ad-
dress an inmate’s grievance on the merits without rejecting it
on procedural grounds, the grievance has served its function
of alerting the state and inviting corrective action, and de-
fendants cannot rely on the failure to exhaust defense.” 655
F.3d at 722. In Maddox, the prison was aware of the content of
the prisoner’s complaint and chose to forgive its untimeliness
by deciding the issue on the merits. This is not what happened
here. The Jail did not overlook a procedural deficiency regard-
ing King’s grievance. Unlike the prison in Maddox, the Jail was
not aware of King’s claim against Szul and was therefore un-
able to address the issue on the merits.
 Lastly, King argues that the district court’s opinion creates
a requirement to name, identify, or describe the responsible
oﬃcers, conflicting with the guidance in the Inmate Hand-
book, which requires only that prisoners “provide the specific
date, location, and time of the incident.” King misunder-
stands, however, the court’s opinion. The requirement to pro-
vide some identifying information about the accused individ-
uals does not stem solely from CCDOC policy. Independent
of the requirements of the Jail, our case law provides that pris-
oners must give the prison “a fair opportunity to address his
complaint” prior to filing suit. Id. Because King did not do so
12 No. 22-1611

here, the district court was right to grant summary judgment
in favor of the defendants.
 III. Conclusion
 King appeals the district court’s grant of summary judg-
ment on his failure-to-protect claim and delayed-medical-
treatment claim. We find that the district court erred regard-
ing the former but aﬃrm with respect to the latter. Because
the Jail’s procedure for grievances that are referred to OPR or
the Divisional Superintendent is so obscure that no ordinary
prisoner could make sense of it, the remedy was unavailable,
and King was not required to exhaust it before bringing his
failure-to-protect claim in federal court. King was, however,
required to exhaust the grievance procedure with respect to
his delayed-medical-treatment claim. He failed to do so. As
such, summary judgment was warranted on that claim.
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED